IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| ROGER LEISHMAN,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON ATTORNEY GENERAL'S OFFICE; SHANE ESQUIBEL and ANN ESQUIBEL; WESTERN WASHINGTON UNIVERSITY; and BRUCE SHEPARD and CYNDIE SHEPARD,<br><br>Defendants. | No.<br><br>COMPLAINT |

Plaintiff Roger Leishman alleges as follows:

**I. PARTIES**

1. Plaintiff Roger Leishman is a graduate of Yale Law School, and has been a member of the Washington bar since 1990. He is a gay disabled single father with three school-aged children. Leishman is a resident of Whatcom County, Washington, and currently unemployed.

COMPLAINT - 1

2. Defendant Washington Attorney General's Office ("the AGO") is an agency of the State of Washington.

3. Defendant Shane Esquibel is the Chief Deputy Attorney General of Washington. Esquibel is married to Ann Esquibel. At all times relevant herein, Esquibel acted for the benefit of the marital community, and as the agent of the AGO.

4. Defendants AGO and Esquibel are referred to collectively as the AGO Defendants.

5. Defendant Western Washington University ("WWU") is an agency of the State of Washington.

6. Defendant Bruce Shepard is the former President of WWU. Shepard is married to Cyndie Shepard. At all times relevant herein, Shepard acted for the benefit of the marital community, and as the agent of WWU.

7. Defendants WWU and Shepard are referred to collectively as the WWU Defendants.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over the parties to and the subject matter of this action, and venue is proper in King County, Washington.

## III. FACTS

9. Leishman incorporates all preceding paragraphs as if fully set forth herein.

10. Leishman graduated from Yale Law School in May 1990.

11. From September 1990 to September 1995, Leishman worked in Seattle at the law firm of Bogle & Gates as a litigation associate.

12. From September 1995 to June 2000, Leishman worked in Chicago at the ACLU of Illinois, as Director of the LGBT Rights / AIDS & Civil Liberties Project.

13. From September 2000 to November 2002, Leishman worked in Seattle at Rhode and Van Kampen PLLC, an intellectual property boutique, as the firm's senior associate.

14. From November 2002 to March 2015, Leishman worked in Seattle at Davis Wright Tremaine LLP, originally Of Counsel and later as a partner.

15. From 2009 to 2012, Leishman served on the Board of Governors of the Washington State Bar Association.

16. On July 14, 2015, Leishman began employment with the AGO in Bellingham as chief legal advisor to WWU.

17. Shortly after commencing work at the AGO, Leishman began exhibiting serious trichotillomania, anxiety, and other symptoms. Leishman promptly disclosed his symptoms and his history of managing anxiety to the AGO.

18. Leishman's symptoms were rooted in trauma that occurred decades before, but they were triggered by Defendants' conduct.

19. In October 2015, the AGO took substantial adverse employment action against Leishman in response to conduct related to his disability and sexual orientation.

20. On October 16, 2015, inspired by a presentation on managing stress at the AGO's annual all-attorney conference, Leishman informed the AGO he intended to seek a reasonable accommodation of his increasingly frustrating disability symptoms.

21. On November 10, 2015, Leishman met with his new Bellingham physician, who diagnosed him with Post Traumatic Stress Disorder and serious codependency.

22. Leishman began treatment for PTSD and codependency in November 2015.

23. On January 7, 2016, Leishman discovered the AGO had taken adverse employment action against him in October 2015 based on homophobic allegations made

by his immediate supervisor, Bellingham Education "Team Leader" Kerena Higgins. Neither Higgins nor anyone else from the AGO had previously informed him about her allegations, and never gave him an opportunity to respond.

24. On January 22, 2016, Leishman confirmed to representatives of the AGO Human Resources department that he intended to move forward with a formal disability accommodation request, and offered to work with the AGO to tailor an accommodation questionnaire to address the particular circumstances presented by his type of disability.

25. On February 4, 2016, the AGO repeated homophobic statements about Leishman in a letter to his therapist regarding Leishman's disability.

26. On February 22, 2016, Leishman submitted a detailed written disability accommodation request to the AGO.

27. AGO Policy 1.08 sets forth procedures for handling complaints of discrimination.

28. On March 1, 2016, Leishman provided Higgins with a copy of a draft discrimination complaint regarding her homophobic statements that had been the basis of the AGO's adverse employment actions, and met privately in his office with Higgins to see if they could resolve the matter privately in accordance with AGO policy.

29. Higgins denied any wrongdoing in connection with her statements. During their March 1, 2016 meeting, Higgins also accused Leishman of faking his disability, and refused to consider supporting his then-pending accommodation request.

30. Leishman raised his voice after Higgins accused him of faking his disability. Leishman's response to her provocation was typical for someone with PTSD.

31. On March 2, 2016, Leishman submitted his written sexual orientation complaint pursuant to AGO Policy 1.08. Leishman alleged the AGO had discriminated against him on the basis of sexual orientation in its handling of Higgins' homophobic

allegations, and that the AGO's actions were part of a pattern of implicit and explicit workplace homophobia.

32. Leishman's discrimination complaint contended the AGO acted on the basis of deeply rooted implicit and explicit homophobia when it took serious adverse action against him (such as giving $3,000 raises to every Assistant Attorney General except Leishman in October 2015).

33. On March 4, 2016, Leishman sent an email to Deputy Attorney General Christina Beusch, who had denied his reasonable accommodation request on various enumerated grounds earlier in the week. Leishman's email politely responded to each of the fallacious arguments set forth in Beusch's denial letter.

34. On March 7, 2016, Beusch's subordinate Regional Services Division Chief Michael Shinn came to Leishman's office at WWU after placing a noon meeting on his calendar that morning. Without any prior warning, Shinn handed Leishman a letter from Beusch placing Leishman on home assignment, effective immediately.

35. During their March 7, 2016 meeting, Shinn informed Leishman the AGO was aware of his sexual orientation discrimination complaint and took it seriously, and said Leishman would be contacted when the AGO appointed someone to investigate his discrimination complaint.

36. Leishman remained on home assignment from March 7, 2016 until his employment with the AGO ended on June 1, 2016.

37. During this home assignment, no one from the AGO or WWU ever contacted Leishman, except for administrative communications related to scheduling and Leishman's pending sexual orientation discrimination complaint. The AGO refused even to forward Leishman's personal and professional correspondence.

38. The AGO's abusive indefinite home assignment exacerbated Leishman's disability symptoms and caused substantial distress to him and his family.

39. The AGO placed Leishman on its abusive home assignment in retaliation for Leishman's attempts to seek a nondiscriminatory workplace.

40. The State of Washington and Seattle firm Ogden Murphy Wallace PLLC ("OMW") are parties to a Master Contract under which OMW is authorized to provide enumerated employment-related services to State agencies.

41. On March 10, 2016, OMW executed a Work Order prepared by the AGO pursuant the Master Contract between the State and OMW.

42. The Work Order authorized OMW to conduct an investigation solely related to Leishman's allegations of discrimination based on sexual orientation.

43. On March 11, 2016, Esquibel convened a conference call with attorney Patrick Pearce, a member of OMW, to discuss the scope of the OMW Investigation.

44. Esquibel directed the OMW Investigation.

45. Esquibel's subordinate Assistant Attorney General Kari Hanson also participated in the March 11, 2016 conference call with Esquibel and Pearce.

46. During the March 11, 2016 conference call, Esquibel directed Pearce to investigate a second, unrelated issue: secret complaints from Shepard and from Leishman's supervisors at the AGO regarding Leishman's workplace conduct ("Employee Conduct Allegations").

47. Defendants intentionally concealed the Employee Conduct Allegations from Leishman.

48. Defendants intentionally concealed from Leishman the fact that Shepard was the source of discriminatory Employee Conduct Allegations.

49. The Employee Conduct Allegations included objections to behavior related to Leishman's disability.

50. The Employee Conduct Allegations reflected Defendants' implicit and explicit bias against Leishman on the basis of his sexual orientation.

51. The Employee Conduct Allegations reflected Defendants' implicit and explicit bias against Leishman on the basis of his disability.

52. Esquibel intended to use the Employee Conduct Allegations as a pretext for terminating Leishman's employment.

53. On March 15, 2016, Rochelle LaRose, Managing Human Resources Consultant with the AGO, informed Leishman that attorney Patrick Pearce had been appointed as an independent outside investigator under AGO Policy 1.08 to investigate the allegations in Leishman's sexual orientation discrimination complaint.

54. During their March 15, 2016 telephone conversation, Leishman asked LaRose to confirm the scope of the OMW Investigation.

55. LaRose confirmed the OMW Investigation was limited to the sexual orientation discrimination issues raised by Leishman's complaint to his employer.

56. On March 16, 2016, Leishman spoke by telephone with Patrick Pearce.

57. During their March 16, 2016 telephone conversation, Leishman informed Pearce he understood the scope of the OMW Investigation was limited to discrimination based on sexual orientation.

58. During their March 16, 2016 telephone conversation, Pearce concealed the fact that Esquibel had directed Pearce to include the Employee Conduct Allegations within the scope of the OMW Investigation.

59. After speaking with Leishman, on March 16, 2016 Pearce sent an email to Esquibel and Hanson informing them that Leishman understood the scope of the OMW Investigation was limited to discrimination based on sexual orientation.

60. Pearce's March 16, 2016 email asked the AGO to confirm that the scope of the OMW Investigation nevertheless included two separate issues: (1) discrimination based on sexual orientation; and (2) Employee Conduct Allegations.

61. On March 16, 2016, Hanson sent an email to Pearce and Esquibel confirming their shared secret understanding regarding the scope of the OMW Investigation.

62. On March 17, 2016, Pearce interviewed Leishman in a conference room at OMW's Seattle office.

63. At the beginning of their March 17, 2016 interview, Pearce again informed Leishman that OMW's investigation was limited to the sexual orientation discrimination issues raised by Leishman's complaint.

64. Pearce also represented that his role was not to resolve disputed factual issues or make credibility determinations, but rather to collect relevant evidence and present it to the AGO.

65. Leishman reasonably relied on the AGO's representations regarding the scope of the OMW Investigation.

66. During his March 17, 2016 interview, Leishman informed Pearce of his belief that the AGO placed him on the abusive home assignment in retaliation for Leishman's attempts to seek a nondiscriminatory workplace during the week prior to March 7, 2016.

67. The AGO never informed Leishman that his home assignment had any relationship to the Employee Conduct Allegations, including Leishman's alleged conduct during his March 1, 2016 meeting with Higgins.

68. On March 22, 2016, Leishman engaged employment attorney Sean Phelan of the Seattle firm Frank Freed Subit & Thomas. Phelan has substantial experience in disability, mental illness, and reasonable accommodation issues.

69. During 2016, Phelan represented Leishman in connection with all issues related to his employment dispute, with the sole exception of Leishman's pending sexual orientation discrimination complaint.

70. On March 28, 2016, Phelan attempted to contact the AGO regarding the status of his employment and potential accommodations of Leishman's disability.

71. On March 29, 2016, Hanson telephoned Phelan and identified herself as the employment attorney representing the AGO.

72. In multiple communications to Hanson from March 29, 2016 through May 2, 2016, Phelan requested that the AGO engage in a good faith interactive dialogue about Leishman's disability.

73. Hanson refused to communicate with Leishman's attorney about his disability, his accommodation request, or his home assignment.

74. Hanson informed Phelan that the AGO was waiting for OMW to complete its investigation into Leishman's sexual orientation discrimination complaint before the AGO would respond to any of her inquiries.

75. On April 5, 2016, Leishman sent Pearce copies of background materials and other documents related to his sexual orientation discrimination complaint.

76. On April 13, 2016, at Pearce's request, Leishman sent OMW a detailed written chronology enumerating multiple examples of homophobia and implicit bias at the

1 AGO, and identifying additional witnesses and documents related to his sexual orientation discrimination complaint.

77. On April 14, 2016, Pearce again interviewed Leishman *ex parte* at OMW's Seattle office.

78. Notwithstanding the requirements of Rule of Professional Responsibility 4.2, no one from the AGO or OMW obtained Phelan's consent to communicate with Leishman *ex parte* regarding the subject matter of Phelan's representation.

79. On April 25, 2016, Pearce provided a "Draft Investigation Report" to the AGO.

80. On April 29, 2016, Pearce provided his final investigation report ("OMW Report") to the AGO.

81. Neither the AGO nor OMW provided copies of the draft or final OMW Report to Leishman or his attorney.

82. Leishman and his attorney were never given any opportunity to review or discuss drafts of the OMW Report, or to respond to the Employee Conduct Allegations.

83. Prior to May 9, 2016, the AGO never informed Leishman the scope of the OMW Investigation included any issue other than discrimination based on sexual orientation.

84. If at any time before May 9, 2016, Leishman had known the AGO's and OMW's representations were false, Leishman and his disability lawyer would have objected immediately. They would have refused to participate any further in the purportedly "independent" investigation into Leishman's sexual orientation discrimination complaint, and they would have insisted the AGO engage without further delay in good faith interactive process to address Leishman's separate pending disability accommodation request.

85. On May 3, 2016, Phelan sent Hanson another email regarding the disability accommodation process.

86. In her May 3, 2016 email, Phelan informed Hanson that Leishman had "recently been evaluated by a psychiatrist with regard to his medical condition and its impact on his ability to perform his job – and specifically its impact on his interactions with others in the workplace." Phelan asked Hanson to forward an "accommodation assessment form to send to the psychiatrist to complete."

87. On May 4, 2016, Hanson finally responded to repeated inquiries from Leishman's attorney by sending an email to Phelan suggesting they confer the following week.

88. Later on May 4, 2016, Phelan sent an email to Hanson agreeing to accommodate the AGO's scheduling request and to meet with Hanson the following week. Phelan's email also renewed her request that Hanson send a copy of the State's preferred disability accommodation form.

89. After receiving Phelan's May 4, 2016 email, Hanson forwarded their May 3, 2016 and May 4, 2016 email correspondence to Esquibel and other senior lawyers within the AGO.

90. On May 5, 2016, representatives of the AGO informed Leishman the OMW Investigation was complete, and summoned him to meet at the AGO office in Seattle on May 9, 2016, the following Monday.

91. There was no discussion at the May 9, 2016 meeting. Instead, Deputy Attorney General Beusch handed Leishman a one sentence letter terminating his employment effective June 1, 2016, together with copies of the OMW Report.

92. Contrary to the terms of the contractual Work Order, the OMW Report was not limited to the sexual orientation discrimination issues raised by Leishman's complaint.

93. The OMW Report stated the OMW investigation involved "two issues: A) whether Assistant Attorney General Roger Leishman experienced discrimination based on his sexual orientation; and B) whether Mr. Leishman conducted himself appropriately in a March 1, 2016 meeting in his office with his supervisor."

94. The OMW Report primarily addressed the Employee Conduct Allegations.

95. The OMW Report failed to address the extensive evidence of implicit and explicit workplace homophobia at the AGO that Leishman had provided.

96. The OMW Report repeatedly relied on information obtained during the investigator's *ex parte* interrogation of Leishman regarding the subject matter of his representation by counsel.

97. The OMW Report repeated unreliable and false hearsay as true.

98. The OMW Report included numerous material false or misleading statements and omissions.

99. Rather than collect relevant evidence and present it to the AGO, the OMW Report purported to resolve disputed factual issues and make credibility determinations.

100. The AGO commissioned the OMW Report in retaliation for Leishman's attempts to seek a nondiscriminatory workplace.

101. The AGO relied on the OMW Report as a basis for terminating Leishman.

102. From May 4, 2016 through October 2016, the AGO convened numerous high-level secret Damage Control Meetings to address the consequences of the AGO Defendants' unlawful response to Leishman's disability and his sexual orientation and his engagement of counsel.

103. Esquibel led the AGO Damage Control Meetings.

104. Other senior AGO attorneys who participated in the Damage Control Meetings include Pamela Anderson, Christina Beusch, Paige Dietrich, Christopher

Lanese, Valerie Petrie, and Michael Shinn (collectively "Other AGO Managing Attorneys").

105. Lawyers for the AGO and for Leishman mediated in Seattle in October 2016.

106. Prior to the mediation, Defendants intentionally concealed material information from Leishman and his attorney.

107. The parties reached agreement on the terms of a written Settlement Agreement including an Addendum that was signed in November 2016.

108. The AGO Defendants fraudulently and wrongfully induced Leishman to enter into the Settlement Agreement.

109. Under the Settlement Agreement, Leishman released his claims against the State, including the AGO, and any officers, agents, employees, agencies, or departments of the State of Washington.

110. The Settlement Agreement, including the release provision, does not refer to OMW or Pearce, and does not include a release of OMW or Pearce.

111. The Settlement Agreement prohibits representatives of the AGO from communicating about Leishman's former employment to third parties, including potential employers like WWU.

112. On May 10, 2017, Leishman filed a lawsuit in King County Superior Court against OMW and Pearce.

113. The OMW Lawsuit is currently pending in the Washington Supreme Court, Case No. 77734-8. Oral argument is scheduled for June 9, 2020.

114. Leishman first learned of Esquibel's involvement in the OMW Investigation on October 20, 2017, when counsel for OMW belatedly produced a copy of

Pearce's March 16, 2016 email to Esquibel and Hanson regarding the true scope of the OMW Investigation.

115. Since October 20, 2017, Leishman has diligently attempted to uncover the full extent of Defendants' wrongdoing, including through requests under the Public Records Act.

116. Defendants have repeatedly attempted to conceal their wrongdoing.

117. Since November 2016, additional AGO lawyers have participated in Defendants' wrongful conduct, including Assistant Attorney General Suzanne LiaBraaten, a lawyer from the AGO's Tort Division assigned to these matters in June 2017.

118. Senior AGO lawyers, including Esquibel, Solicitor General Noah Purcell, and the Other AGO Managing Attorneys, ordered the conduct involved, or, with knowledge of the specific conduct by junior AGO lawyers, ratified the conduct involved.

119. Senior AGO lawyers, including Esquibel, Solicitor General Noah Purcell, and the Other AGO Managing Attorneys, knew of the conduct by junior AGO lawyers at a time when its consequences could be avoided or mitigated, but failed to take reasonable remedial action.

120. Both before and after November 2016, Defendants conspired to harm Leishman.

121. Both before and after November 2016, Defendants' conduct harmed Leishman.

122. Both before and after November 2016, Defendants conspired to conceal their wrongdoing.

123. In Spring 2016, at Shepard's direction WWU personnel destroyed evidence related to Leishman's employment.

124. Since November 2016, the AGO has breached the provision of the Settlement Agreement prohibiting the AGO from communicating about Leishman's former employment.

125. Since November 2016, the AGO and WWU have violated provisions of Washington and federal law that prohibit employers from considering conduct related to a candidate's disability, or retaliating for a candidate's prior exercise of rights under the Washington Law Against Discrimination and the Americans with Disabilities Act.

126. Defendants' conduct exacerbated Leishman's disability symptoms and caused substantial distress to him and his family.

127. During a substantial portion of the period from November 2016 to January 2020, Leishman was incapacitated by his disability, including by the injuries Defendants caused.

128. Since November 2016, Defendants have interfered with Leishman's efforts to gain suitable employment and to revive his professional career.

129. Since November 2016, Defendants have interfered with Leishman's efforts to discover the true circumstances of his wrongful termination and to petition for redress.

130. Within the AGO's organization, the "Chief Deputy Attorney General" is appointed by the elected Attorney General as his or her top lieutenant.

131. Defendants acted with the knowledge and approval of Washington Attorney General Bob Ferguson.

## IV. CLAIMS FOR RELIEF

132. At a minimum, Defendants conduct constitutes negligence, discrimination, misrepresentation, breach of contract, and deprivation of rights under color of state law.

## V. ALTERNATIVE ADDITIONAL CLAIMS

133. Pursuant to CR 8(e)(2), Leishman alleges Paragraphs 134 through Paragraph 136 in the alternative.

134. In the separate pending OMW Lawsuit, Leishman seeks damages for injuries caused by conduct occurring before November 2016.

135. In the event that Leishman obtains an adequate recovery from OMW, his claims against Defendants will be limited to damages for injuries by conduct occurring after November 2016.

136. In the event that Leishman fails to obtain an adequate recovery from OMW, this suit will also seek damages for injuries by conduct occurring after November 2016.

137. Leishman therefore requests in the alternative that the Court rescind or reform the Settlement Agreement to the extent necessary to achieve the ends of justice in light of Defendants' misconduct.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Roger Leishman respectfully prays for the following relief:

138. Entry of a money judgment jointly and severally against Defendants in an amount to be proved at trial, and in any event no less than $2,000,000.

139. Rescission or reformation of the Settlement Agreement and Release as deemed appropriate by the Court.

140. An award of Leishman's reasonable attorney's fees, expenses and costs, to the fullest extent allowed by law and equity; and

141. Any further relief as this Court may deem necessary and proper.

DATED this 24th day of April, 2020.

                                           */s/ Roger A. Leishman*
                                           Roger A. Leishman, WSBA # 19971
                                           *Pro se*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25